# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

J&A FREIGHT SYSTEMS, INC., an Illinois )
Corporation, )
                                     )

              **Plaintiff,**   )   **No. 14 C 1581**

                           )

              **v.**          )   **Jeffrey T. Gilbert**
                           )   **Magistrate Judge**

TRAVELERS PROPERTY CASUALTY )
COMPANY OF AMERICA, a Foreign )
Corporation, and RJ AHMANN COMPANY,)
a/k/a AHMANN MARTIN, a Foreign )
Corporation, )
                                       )

            **Defendants.**   )

## MEMORANDUM OPINION AND ORDER

There are three motions for summary judgment now before the Court. Plaintiff J&A Freight Systems, Inc. ("J&A") has filed a motion for partial summary judgment. Plaintiff J&A's Motion for Partial Summary Judgment against Defendant Travelers ("J&A's Motion"), [ECF No. 86]. Defendant Travelers Property Casualty Company of America ("Travelers") and Defendant RJ Ahmann Company, a/k/a Ahmann Martin, ("RJ Ahmann") have moved separately for summary judgment on all counts against them. Travelers' Motion for Summary Judgment ("Travelers' Motion"), [ECF No. 87]; Defendant RJ Ahmann Company's Motion for Summary Judgment ("RJ Ahmann's Motion"), [ECF No. 90]. For the reasons set forth in this Memorandum Opinion and Order, Travelers' Motion [ECF No. 87] is granted, J&A's Motion [ECF No. 86] is denied as moot, and RJ Ahmann's Motion [ECF No. 90] is granted in part and denied in part.

# I.   FACTUAL BACKGROUND

J&A acts as a transportation broker by arranging for third-party carriers to transport its client's cargo.  Travelers' Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment ("Travelers' SoF"), [ECF No. 89], ¶¶ 1, 9, 15; RJ Ahmann Company's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment ("RJ Ahmann's SoF"), [ECF No. 92], ¶ 1 at p. 1; Plaintiff J&A's Local Rule 56.1(a) Statement of Material Facts in Support of Its Motion for Partial Summary Judgment against Defendant Travelers ("J&A's SoF"), [ECF No. 86-1], ¶¶ 2, 9.  In August 2013, someone who called himself "Don" stole a load of copper wire valued at $116,163.60.  Travelers' SoF, [ECF No. 89], ¶¶ 12, 14–15; RJ Ahmann's SoF, [ECF No. 92], ¶¶ 7, 9–10 at p. 3; J&A's SoF, [ECF No. 86-1], ¶¶ 9–11.  Don carried out his scheme by deceiving J&A.  Travelers' SoF, [ECF No. 89], ¶¶ 1, 9, 15; RJ Ahmann's SoF, [ECF No. 92], ¶ 1 at p. 1; J&A's SoF, [ECF No. 86-1], ¶¶ 2, 9.  J&A had used an online posting service to find a carrier interested in transporting the soon-to-be missing load.  Travelers' SoF, [ECF No. 89], ¶¶ 6–7; RJ Ahmann's SoF, [ECF No. 92], ¶¶ 2–3 at p. 2.  Don responded to the posting and held himself out as a representative of Litmax Lines, Inc., which is a legitimate carrier that J&A had used before.  Travelers' SoF, [ECF No. 89], ¶¶ 9–10; RJ Ahmann's SoF, [ECF No. 92], ¶¶ 4–5 at p. 3.  Don even provided some written information to J&A, including a purported insurance certificate and a W-9.  Travelers' SoF, [ECF No. 89], ¶ 11; RJ Ahmann's SoF, [ECF No. 92], ¶ 6 at p. 3.

J&A worked with Don to arrange the transportation of a load of copper wire for Coleman Cable, one of J&A's customers.  J&A's SoF, [ECF No. 86-1], ¶¶ 7–8; *see also* Travelers' SoF, [ECF No. 89], ¶¶ 6, 12.  On August 14, 2013, Don, or someone affiliated with him, picked up the load at Coleman Cable's facility.  Travelers' SoF, [ECF No. 89], ¶ 12; RJ Ahmann's SoF, [ECF

No. 92], ¶ 7 at p. 3. The load never reached its destination. Travelers' SoF, [ECF No. 89], ¶ 14;

J&A's SoF, [ECF No. 86-1], ¶ 10. Eventually, J&A found out Don was an imposter who was

not actually associated with Litmax. Travelers' SoF, [ECF No. 89], ¶ 15; J&A's SoF, [ECF No.

86-1], ¶ 9. The realization came too late, and the load was never recovered. Travelers' SoF,

[ECF No. 89], ¶ 14; J&A's SoF, [ECF No. 86-1], ¶ 10.

After its belated discovery, J&A submitted to Travelers a claim for $116,163.60 under

J&A's contingent cargo insurance policy for 2013 to 2014. Travelers' SoF, [ECF No. 89], ¶¶ 16,

19; RJ Ahmann's SoF, [ECF No. 92], ¶ 11 at p. 3, ¶ 22 at p. 6; J&A's SoF, [ECF No. 86-1], ¶ 12.

Contingent cargo insurance provides coverage for commodities and perils when a transportation

carrier's insurance policy either may not cover the loss or was cancelled without the

transportation broker's knowledge. Travelers' SoF, [ECF No. 89], ¶ 17; RJ Ahmann's SoF,

[ECF No. 92], ¶ 12 at p. 4. After reviewing J&A's claim for the stolen copper wire, Travelers

determined that J&A's policy covered the Coleman Cable loss but that coverage was limited to

$50,000. J&A's SoF, [ECF No. 86-1], ¶ 13. Based on its final claims determination, Travelers

issued payment in that amount to Coleman Cable. Travelers' SoF, [ECF No. 89], ¶ 21; RJ

Ahmann's SoF, [ECF No. 92], ¶ 23 at p. 6; J&A's SoF, [ECF No. 86-1], ¶ 14.[1] J&A did not

agree with Travelers' determination. J&A's SoF, [ECF No. 86-1], ¶¶ 15–16. Rather, it believed

its policy covered the full value of the loss. *Id.* Coleman Cable rejected Travelers' payment, and

the check that Travelers issued was never cashed. Travelers' SoF, [ECF No. 89], ¶ 26; RJ

Ahmann's SoF, [ECF No. 92], ¶ 27 at p. 7; J&A's SoF, [ECF No. 86-1], ¶ 17. J&A itself

---

[1] By finding the loss was covered under J&A's policy, Travelers treated the imposter who stole the Cable
Coleman shipment as a "carrier" within the meaning of J&A's policy. Travelers' SoF, [ECF No. 89], ¶
22; RJ Ahmann's SoF, [ECF No. 92], ¶ 24 at p. 6; J&A's SoF, [ECF No. 86-1], ¶ 2. This is consistent
with how Travelers treated other imposters under the same type of policy. Travelers' SoF, [ECF No. 89],
¶ 24; RJ Ahmann's SoF, [ECF No. 92], ¶ 25 at p. 6; J&A's SoF, [ECF No. 86-1], ¶¶ 3–4.

reimbursed Coleman Cable for the full value of the lost copper wire. RJ Ahmann's SoF, [ECF No. 92], ¶ 27 at p. 7; J&A's SoF, [ECF No. 86-1], ¶ 17.

Starting in 2005, J&A procured its contingent cargo insurance from Travelers with the help of RJ Ahmann, an insurance broker. The policy that RJ Ahmann procured included some coverage for loss caused by a carrier's dishonest acts, which Travelers typically does not cover. RJ Ahmann's SoF, [ECF No. 92], ¶¶ 13–14 at p. 4. This additional coverage was reflected in an endorsement titled "Freight Charges, Loading and Unloading, and 'Carrier' Dishonesty Coverage Endorsement." *Id.* ¶ 16 at p. 4. Working with RJ Ahmann, J&A renewed its coverage each year without changes material to this lawsuit until 2010, when J&A asked RJ Ahmann to obtain additional coverage for Coleman Cable shipments. *Id.* ¶ 17 at p. 5. This request triggered a series of communications in which J&A told RJ Ahmann that Coleman Cable shipments were worth up to $140,000 per shipment and that J&A was concerned the shipments could be stolen. J&A's Combined Statement of Material Facts Requiring Denial of Travelers' and RJA's Respective Motions for Summary Judgment ("J&A's Statement of Additional Facts"), [ECF No. 99], ¶¶ 5–7; RJ Ahmann Company's Reply to J&A's Combined Statement of Material Facts, [ECF No. 103], at 3–4. The parties dispute exactly what additional coverage J&A ultimately requested for Coleman Cable shipments, but there is no dispute that RJ Ahmann procured at least some additional coverage and that this coverage was reflected in an endorsement titled "Scheduled Shipper Coverage." RJ Ahmann's SoF, [ECF No. 92], ¶ 17 at p. 5; J&A's Statement of Additional Facts, [ECF No. 99], ¶ 4.

Between 2010 and 2013, J&A renewed its policy with Travelers without making any more changes that are material to its claims in this case. Before each of these renewals, J&A and RJ Ahmann would communicate about what coverage J&A needed and what coverage it had.

*See* J&A's Statement of Additional Facts, [ECF No. 99], ¶ 9, 11. In particular, before renewing the policy in April 2013, J&A and RJ Ahmann exchanged a series of emails regarding J&A's insurance coverage. *See* J&A's Statement of Additional Facts, [ECF No. 99], ¶¶ 8–9; RJ Ahmann Company's Reply to J&A's Combined Statement of Material Facts, [ECF No. 103], at 5. Again, the parties disagree about the import of these communications, and that dispute will be discussed below.

J&A sued Travelers and RJ Ahmann, claiming that either its policy with Travelers covers the full value of the Coleman Cable loss or RJ Ahmann wrongfully procured an insurance policy that did not provide enough coverage. Amended Complaint, [ECF No. 46]. In its amended complaint, J&A asserts six counts, four against Travelers and two against RJ Ahmann. The Court dismissed the claims against Travelers for fraudulent concealment (Count III) and equitable estoppel (Count IV). Minute Entry Dated 7/7/14, [ECF No. 27]. That leaves J&A's claims against Travelers for breach of contract (Count I) and unreasonable and vexatious delay in violation of 215 ILL. COMP. STAT. 5/155 (Count II). Amended Complaint, [ECF No. 46], ¶¶ 20–30. The two counts against RJ Ahmann are for breach of fiduciary duty (Count V) and negligence (Count VI). *Id.* ¶¶ 49–79. As stated above, Travelers and RJ Ahmann have moved for summary judgment on all of the remaining claims against them, and J&A has moved for summary judgment on three of Travelers' affirmative defenses.

## II.    LOCAL RULE 56.1

Local Rule 56.1 imposes certain obligations on parties when they file motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). Among these, Local Rule 56.1 requires the moving party to submit a statement of material facts that consists of short numbered paragraphs. N.D. ILL. R.

5

56.1(a). The party opposing summary judgment then must file a concise response to the movant's statement of facts. N.D. ILL. R. 56.1(b)(3). That response must contain "numbered paragraphs, each corresponding to and stating a concise summary of the paragraph [from the movant's statement] to which it is directed." N.D. ILL. R. 56.1(b)(3)(A). The response also must contain "a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. ILL. R. 56.1(b)(3)(B). The non-movant may file a statement setting forth additional facts that require the denial of summary judgment. N.D. ILL. R. 56.1(b)(3)(C). If the non-movant does so, its additional facts must be contained in a separate statement and cannot be lumped in with its responses to the movant's statement. *Boyd v. City of Chicago*, --- F. Supp. 3d --- , 2016 WL 7157354, at *5 (N.D. Ill. Dec. 6, 2016); *De v. City of Chicago*, 912 F. Supp. 2d 709, 715 (N.D. Ill. 2012).

Both Travelers and RJ Ahmann have complied with Local Rule 56.1(a) by filing the required statements in support of their respective motions for summary judgment. Travelers' SoF, [ECF No. 89]; RJ Ahmann's SoF, [ECF No. 92]. J&A, however, has not responded to these statements in the prescribed manner. Instead, J&A filed one combined response to both Defendants' statements. J&A's Statement of Additional Facts, [ECF No. 99]. That filing only consists of separate numbered paragraphs laying out additional facts. It does not contain paragraphs that correspond to, summarize, and respond to the numbered paragraphs in Defendants' statements. Therefore, J&A has not complied with Local Rule 56.1(b)(3)(A) and (B).[2]

---

[2] Both Defendants pointed out J&A's failure in their respective responses to J&A's Statement of Additional Facts. Travelers' Response to J&A's Combined Statement of Material Facts, [ECF No. 102], at 1–2; RJ Ahmann Company's Reply to J&A's Combined Statement of Material Facts, [ECF No. 103],

Because Local Rule 56.1 serves an important function by organizing evidence and identifying disputed facts, the court has the discretion to require strict compliance. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). The court may deem a statement of fact admitted when a non-movant has not responded to that statement in the mandated manner. N.D. ILL. R. 56.1(b)(3)(C); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008); *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

In this case, the Court will neither slam J&A with the full force permitted by Local Rule 56.1 nor expend significant time and effort to make up for J&A's violation. To the extent that J&A's briefs and statements of fact clearly controvert one of Defendants' statements, the Court will not deem the Defendant's statement to be admitted. The Court will take this approach because the parties' filings identify the material factual disputes and cite to the relevant evidence, even if J&A has not complied fully with the Local Rules. Adopting this convention, the Court can resolve the present motions on the merits rather than by default.[3]

## III. LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of

---

at 1–2. But J&A neither offered a justification (or even an explanation) for its violation of Local Rule 56.1 nor sought leave to remedy its error.

[3] Defendants have not asserted that J&A's failure to comply with Local Rule 56.1(b)(3) prejudiced their ability to defend their respective motions.

7

establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether there is a genuine issue of fact, a district court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). And the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, a court does not "evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter" but rather "determine[s] whether there exists a genuine issue of triable fact." *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008) (citation omitted). The court cannot make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Anderson*, 477 U.S. at 255; *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1138 (7th Cir. 1994); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993). Rather, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court, therefore, must look at the evidence as a jury might, construing the record in the light most favorable to the nonmoving party and avoiding a

temptation to decide which party's version of the facts is more likely true. *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999).

## IV. DISCUSSION

### A. Travelers' Motion for Summary Judgment

Travelers is seeking summary judgment on Counts I and II of J&A's Amended Complaint. Travelers argues that the insurance policy it issued to J&A unambiguously provides no more than $50,000 in coverage for losses caused by acts of carrier dishonesty. According to Travelers, J&A could not possibly be entitled to more than $50,000 on its claim for the Coleman Cable loss. Travelers says that, because it issued payment in that amount, it neither breached its contract with J&A nor caused an unreasonable and vexatious delay in violation of 215 ILL. COMP. STAT. 5/155. J&A responds by arguing that the Travelers policy is ambiguous as to whether the Coleman Cable loss was subject to the $50,000 limit for carrier dishonesty or to the general limit for Coleman Cable shipments of $150,000. J&A claims that this ambiguity creates a question of fact that precludes summary judgment on Counts I and II. Therefore, the resolution of Travelers' Motion depends entirely on the meaning of J&A's policy.

Under Illinois law, the interpretation of an insurance policy is guided by the same principles that govern the interpretation of other contracts. *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 777 (7th Cir. 2015). "When interpreting an insurance policy, '[the] primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language.'" *Id.* at 777–78 (quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill 2005)). An insurance policy must be interpreted as a whole and every provision must be given effect, if possible. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). Consideration should be given to "the type of insurance purchased, the risks involved, and the

overall purpose of the contract." *Clarendon Nat. Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011); *see also Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 286 (Ill. 2006).

A provision of an insurance policy is ambiguous only when it is subject to more than one reasonable interpretation. *Clarendon*, 645 F.3d at 933; *Nicor*, 860 N.E.2d at 286. A party's ability to suggest creative possibilities for a provision's meaning does not render that provision ambiguous. *Norem v. Lincoln Ben. Life Co.*, 737 F.3d 1145, 1149 (7th Cir. 2013). When determining whether an ambiguity exists, the staring place is the plain and ordinary meaning of the language of the insurance policy. *Ace Am. Ins. Co. v. RC2 Corp.*, 600 F.3d 763, 767 (7th Cir. 2010). If the language is not ambiguous, no further inquiry need be conducted to try to identify an ambiguity. *Id.* It is inappropriate to strain to find an ambiguity where one does not exist. *Wehrle*, 719 F.3d at 843.

The meaning of an insurance policy may be decided on summary judgment. *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 525 (7th Cir. 2013); *Brown & LaCounte, L.L.P. v. Westport Ins. Corp.*, 307 F.3d 660, 662 (7th Cir. 2002). Whether an insurance policy is ambiguous is a question of law. *Cent. Illinois Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004). If the policy is unambiguous, its construction is a question of law. *Cincinnati Ins. Co. v. Allen*, 347 F. Supp. 2d 586, 590 (C.D. Ill. 2004); *Roberts v. Northland Ins. Co.*, 705 N.E.2d 762, 764 (Ill. 1998). If the policy is ambiguous, it will be constructed strictly against the insurer who drafted the policy. *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 491 (Ill. 2001). If the parties offer competing reasonable interpretations of an ambiguous provision that depend on extrinsic evidence, the meaning of the insurance policy

may be a question of fact. *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 351–52 (7th Cir. 2015).

On April 26, 2013, Travelers issued to J&A the contingent cargo insurance policy that was in effect at the time of the Coleman Cable loss. *See* Policy, [ECF No. 89-1], at 2. The basic details of J&A's coverage are described on a page titled "Commercial Inland Marine Coverage Part Declarations." J&A had a $100,000 Limit of Insurance when cargo was transported by a railroad or motor transportation company; the Limit of Insurance for all Covered Property in any one occurrence was $200,000; and J&A's deductible was $1,000. *Id.* at 9. The Contingent Cargo Coverage–Special Form, among other things, defines what is and is not covered property under the policy and states what exclusions apply. Of particular relevance to this case, one of the exclusions states, "We will not pay for 'loss' caused by or resulting from . . . [d]ishonest or criminal acts by" a carrier. *Id.* at 15. This provision, by its plain and ordinary meaning, excludes coverage for losses caused by acts of carrier dishonesty. No party argues otherwise.

As mentioned above, J&A's policy also includes a "Freight Charges, Loading and Unloading, and 'Carrier' Dishonesty Coverage Endorsement." *Id.* at 19. This endorsement—which the Court will call the "Carrier Dishonesty Endorsement"—explicitly states that it modifies the Contingent Cargo Coverage–Special Form. With respect to carrier dishonesty, the endorsement does two things. First, it modifies Section A of the Special Form, which describes the policy's coverage, to provide that Travelers will pay up to $50,000 in any one occurrence for loss to Covered Property "caused by or resulting from any fraudulent, dishonest, or criminal act committed by a 'carrier.'" *Id.* Second, the endorsement replaces the exclusion for carrier dishonesty contained in the Special Form with a new exclusion. *Id.* Crucially, the replacement language includes an exclusion for carrier dishonesty that is, word for word, the exact same as

that in the Special Form. *Id.* The only provision of the endorsement that alters the exclusion is one stating that the exclusion will not apply to the $50,000 of coverage provided in the endorsement. *Id.* In other words, the Carrier Dishonesty Endorsement provides J&A with $50,000 of coverage for loss caused by or resulting from carrier dishonesty but otherwise maintains the exclusion for carrier dishonesty.

This interpretation of the Carrier Dishonesty Endorsement is supported by a ruling in a similar context by the Ninth Circuit. *Intransit, Inc. v. Travelers Prop. & Cas. Co. of Am.*, 583 F. App'x 798 (9th Cir. 2014). In that case, the Ninth Circuit interpreted identical language in another Travelers' policy. *See Intransit, Inc. v. Travelers Prop. & Cas. Co. of Am.*, 2012 WL 5208170, at *3 (D. Or. Oct. 22, 2012), *rev'd and remanded*, 583 F. App'x 798 (9th Cir. 2014). Applying principles of Oregon law that are consistent with Illinois law, the Ninth Circuit concluded that the Carrier Dishonesty Endorsement provided $50,000 of coverage for acts of carrier dishonesty, regardless of whether the carrier was a legitimate or a fraudulent carrier. *Intransit*, 583 F. App'x at 798. But the Ninth Circuit held that, because of the exclusion in the Carrier Dishonesty Endorsement, the policy unambiguously did not entitle the insured to more than $50,000 for a loss caused by carrier dishonesty. *Id.*

Both parties in this case note that the Ninth Circuit's decision is not binding on this Court. But neither party contends the Ninth Circuit erred or claims the application of Illinois law materially changes the analysis employed by the Ninth Circuit. Instead, J&A essentially concedes coverage for loss due to carrier dishonesty would be capped at $50,000 without the endorsement for Cable Coleman shipments added in 2010. The issue, then, is whether this endorsement, which the Court will refer to as the "Coleman Cable Endorsement," provides full coverage for J&A's loss in this case despite the Carrier Dishonesty Endorsement.

The Coleman Cable Endorsement is reflected in the Scheduled Shipper Coverage form. Policy, [ECF No. 89-1], at 27. The form has three sections—A, B, and C—, the last of which was left blank.[4] *Id.* Section A states that, for Coleman Cable shipments, J&A will have a general deductible of $1,000 and a deductible of $2,500 when a loss is due to theft. *Id.* Section B does not modify either the Contingent Cargo Coverage–Special Form or the Carrier Dishonesty Endorsement discussed above. Instead, Section B only modifies Section 1 of the Commercial Inland Marine Coverage Part Declarations. *Id.*[5] Section B modifies the Declarations to increase—for Coleman Cable shipments only—the Limit of Insurance from $100,000 to $150,000 for railroad and motor transportation companies and to increase the limit for one occurrence from $200,000 to $300,000. *Id.* at 27. The Coleman Cable Endorsement does nothing else.

In particular, the Coleman Cable Endorsement does not modify either the $50,000 limit for carrier dishonesty or the exclusion that applies above that limit. It does not even modify the portions of J&A's policy in which the relevant carrier dishonesty provisions are contained. The endorsement does just three things: it increases the general insurance limit for two types of carriers, it increases the per occurrence limit, and it adds a specific deductible for theft. It does not modify the clear and unambiguous language of the Carrier Dishonesty Endorsement. No other interpretation is reasonable in light of the plain and ordinary meaning of the words of the Coleman Cable Endorsement.

J&A offers several arguments to support the proposition that the Coleman Cable Endorsement overrides the $50,000 carrier dishonesty limit and thereby provides coverage up to

---

[4] Section C includes text and four checkboxes. None of the boxes are checked.

[5] Section 1 of the Declarations covers five areas: (1) the limit of insurance by carrier type (including "no coverage" for air freight carriers), (2) the limit of insurance for any one occurrence, (3) the deductible, (4) premium information, and (5) the reporting period. Policy, [ECF No. 89-1], at 9.

$150,000 for carrier dishonesty for Coleman Cable shipments. J&A first asserts that the reference to a $2,500 deductible for theft in the Coleman Cable Endorsement shows the $150,000 limit applies to all theft including a loss covered by the Carrier Dishonesty Endorsement. This interpretation is not reasonable. The deductible and the exclusions are described in different portions of the policy. They can be modified separately, as illustrated by the Carrier Dishonesty Endorsement which altered the exclusion without changing the deductible. Moreover, it is undisputed that J&A's policy covered many kinds of theft (including third-party theft), both before and after the Coleman Cable Endorsement. The policy provided limited coverage for theft due to carrier dishonesty, but it covered all other types of theft that did not fall within an exclusion or exception. The specification of a higher deductible for covered thefts cannot reasonably be interpreted, in light of the other language in the policy, to mean that all theft (including all carrier dishonesty) is covered by the Coleman Cable Endorsement up to the $150,000 limit without regard to the Carrier Dishonesty Endorsement.

In a similar vein, J&A argues that the $2,500 deductible for theft added by the Coleman Cable Endorsement renders the entire policy ambiguous because it is inconsistent with the coverage limitation in the Carrier Dishonesty Endorsement. Again, though, there is nothing ambiguous (or inconsistent) about the $2,500 deductible for theft in the Coleman Cable Endorsement and the coverage exclusion contained in the Carrier Dishonesty Endorsement because, as discussed above, they address different concepts.

J&A's next argument is that the Carrier Dishonesty Endorsement cannot be reconciled with the Coleman Cable Endorsement unless they both are interpreted to provide J&A with coverage up to $150,000 for carrier dishonesty. It is unclear exactly what J&A thinks is irreconcilable. The above discussion shows that the two Endorsements are reconcilable even if

14

J&A's interpretation is not adopted. The Coleman Cable Endorsement provides for $150,000 in coverage but it does not override every other exclusion and exception in the policy. The endorsement covers certain kinds of theft up to $150,000 but does not cover those kinds that are excluded by another provision. The Carrier Dishonesty Endorsement includes a specific exclusion that limits coverage for one kind of theft—carrier dishonesty—to $50,000. That means the Coleman Cable Endorsement does not provide coverage of more than $50,000 for that type of theft. The relationship is no more complicated than that.

J&A also argues the deposition testimony of Kevin Herman shows there is an ambiguity with respect to how the Coleman Cable Endorsement interacts with the other provisions of J&A's contingent cargo policy issued by Travelers. Herman is a technical specialist in Travelers' inland marine claim department, and he was responsible for reviewing the claim that J&A submitted to Travelers for the Coleman Cable loss. During his deposition, Herman was questioned about the first line of the Coleman Cable Endorsement, which states "This endorsement modifies insurance provided under the COMMERCIAL INLAND MARINE COVERAGE PART." Policy, [ECF No. 89-1], at 27. Specifically, Herman was asked where in the policy one could find the Commercial Inland Marine Coverage Part. In response, Herman said the title listed in the endorsement "would lead [one] to believe" it was referring to page 10 of the policy, which is a "table of contents." [ECF No. 99-7], at 114–15.

In essence, J&A's argument is that it is ambiguous what the Coleman Cable Endorsement modifies because it is not clear what constitutes the Commercial Inland Marine Coverage Part. Herman, though, cited a document that lists the forms that make up the Commercial Inland Marine Coverage Part (excluding Declarations or Endorsements, which the "table of contents" says may be attached). Policy, [ECF No. 89-1], at 10. Moreover, on the page that precedes the

table of contents discussed with Herman, the policy clearly states, "The Commercial Inland Marine Coverage Part consists of these Declarations, the Commercial Inland Conditions Form and the Coverage Forms shown below." *Id.* at 9. An earlier page in the policy contains a list of all of the forms, endorsements, and schedule numbers that make up J&A's policy and groups them together into three sections, one of which is titled "Inland Marine." *Id.* at 3. Finally, as noted above, sections B and C of the Coleman Cable Endorsement specify by title the portions of the Commercial Inland Marine Coverage Part that they modify. Therefore, the Court rejects J&A's argument that Herman's testimony shows the policy is ambiguous with respect to what the Coleman Cable Endorsement modifies.

J&A's final argument is that extrinsic evidence shows there is an ambiguity as to whether the Coleman Cable Endorsement covers carrier dishonesty up to $150,000. J&A's contention is problematic as to Travelers because it relies solely on communications J&A had with RJ Ahmann. Regardless, "extrinsic evidence cannot be used to create ambiguity where none otherwise exists." *Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 380–81 (7th Cir. 2009); *see also Commonwealth Ins. Co. v. Stone Container Corp.*, 351 F.3d 774, 779 (7th Cir. 2003) ("Because the language in exclusion H is unambiguous in barring coverage, there is no need to examine any extrinsic evidence."); *Much v. Pac. Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir. 2001) ("If the language unambiguously answers the question at issue . . . the intent of the parties must be determined solely from the contract's plain language, and extrinsic evidence outside the 'four corners' of the document may not be considered."). That means the Court need not assess this argument in more depth.

The Court thus concludes that J&A's policy unambiguously provides coverage of no more than $50,000 for losses of Coleman Cable shipments caused by carrier dishonesty. J&A

does not maintain the loss underlying this case was caused by something other than carrier dishonesty. Because Travelers issued payment to Coleman Cable for $50,000 it did not breach its contract with J&A.[6] Further, Travelers' refusal to pay more than the most it could owe was not vexatious or unreasonable and that means Travelers did not violate 215 ILL. COMP. STAT. 5/155. *See P & M/Mercury Mech. Corp. v. W. Bend Mut. Ins. Co.*, 483 F. Supp. 2d 601, 603–04 (N.D. Ill. 2006) ("An insurer does not act vexatiously and unreasonably when (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.). For all of these reasons, Travelers is entitled to summary judgment on Counts I and II of J&A's Amended Complaint.

## B. J&A's Motion for Summary Judgment

J&A has moved for summary judgment on Travelers' first, second, and third affirmative defenses. J&A's Motion, [ECF No. 86]. After J&A filed its motion, Travelers and J&A agreed that Travelers would withdraw with prejudice its first and second affirmative defenses. *See* Order Regarding Travelers' Withdrawal of Affirmative Defenses, [ECF No. 100].[7] The Court then entered an order striking with prejudice those two defenses. *Id.* This mooted J&A's Motion for Summary Judgment on Travelers' first and second affirmative defenses. *See Excel Golf Tee, Inc. v. Green St. Innovations, Inc.*, 2006 WL 2460579, at *2 (N.D. Ill. Aug. 22, 2006). The

---

[6] Travelers states in its briefs that it may not be required to pay J&A any money because the imposter carrier in this case may not have been a "company." The Court will not now resolve this dispute as any such resolution would be an advisory opinion. The Court's ruling in this Memorandum Opinion and Order simply does not address whether Travelers would breach its contract if, in the future, it were to refuse to pay $50,000 for the Coleman Cable loss.

[7] The parties did not intend this withdrawal to waive any appellate rights with respect to the previous motion practice on Counts II, III, and IV of J&A's Amended Complaint. Order Regarding Travelers' Withdrawal of Affirmative Defenses, [ECF No. 100].

Court's ruling in this Memorandum Opinion and Order on Travelers' Motion for Summary Judgment moots J&A's Motion with respect to Travelers' third affirmative defense. *See Mays v. BNSF Ry. Co.*, 974 F. Supp. 2d 1166, 1179 (N.D. Ill. 2013). Therefore, J&A's Motion for Summary Judgment is denied as moot.

## C. RJ Ahmann's Motion for Summary Judgment

RJ Ahmann has moved for summary judgment on Counts V and VI, the only two counts asserted against it. RJ Ahmann's Motion, [ECF No. 90]. Count V alleges a claim for breach of fiduciary duty and Count VI alleges a claim for negligence. Amended Complaint, [ECF No. 46], ¶¶ 49–79.

### 1. Count V: Breach of Fiduciary Duty

RJ Ahmann asserts it is entitled to summary judgment on J&A's breach of fiduciary duty claim. RJ Ahmann's argument at this stage does not turn on the existence of a duty, whether it breached a duty, or any other element of a breach of fiduciary duty claim. It effectively concedes that its relationship with J&A was a fiduciary relationship. *See DOD Techs. v. Mesirow Ins. Servs., Inc.*, 887 N.E.2d 1, 6 (Ill. App. Ct. 2008) ("Since the enactment of section 2-2201, the relationship between an insured and its broker continues to be a fiduciary one."). Instead, RJ Ahmann contends the Illinois Insurance Placement Liability Act of 1996 ("IIPLA"), 735 ILL. COMP. STAT. 5/2-2201, precludes civil liability for the type of breach of fiduciary duty claim alleged by J&A.

The IIPLA protects insurance brokers from liability for certain types of claims. On its fact, the statute "limit[s] the scope of liability of an insurance producer . . . under standards governing the conduct of a fiduciary or a fiduciary relationship." 735 ILL. COMP. STAT. 5/2-2201(d). Subsection (b) of that statute provides:

> No cause of action brought by any person or entity against any insurance producer
> . . . concerning the sale, placement, procurement, renewal, binding, cancellation
> of, or failure to procure any policy of insurance shall subject the insurance
> producer . . . to civil liability under standards governing the conduct of a fiduciary
> or a fiduciary relationship except when the conduct upon which the cause of
> action is based involves the wrongful retention or misappropriation by the
> insurance producer . . . of any money that was received as premiums, as a
> premium deposit, or as payment of a claim.

*Id.* § 2-2201(b).

Thus, the plain language of § 2-2201(b) "protects the insurance producer from civil liability arising out of the fiduciary relationship." *DOD Techs.*, 887 N.E.2d at 7; *see also Nat'l Union Fire Co. of Pittsburgh, PA v. Pontiac Flying Serv., Inc.*, 2006 WL 3422166, at *6 (C.D. Ill. Nov. 27, 2006). If a breach of fiduciary duty claim falls within subsection (b), then the statute precludes civil liability unless the claim involves the wrongful retention or misappropriation of money. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman–Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017); *Melrose Park Sundries, Inc. v. Carlini*, 927 N.E.2d 132, 137 (Ill. App. Ct. 2010). That is why the Seventh Circuit has characterized the IIPLA as providing an "automatic exemption from liability for breaches of fiduciary duty." *Mizuho Corp. Bank (USA) v. Cory & Assocs., Inc.*, 341 F.3d 644, 652 (7th Cir. 2003); *see also Wallace Auto Parts & Servs., Inc. v. Charles L. Crane Agency Co.*, 2015 WL 8606429, at *3 (S.D. Ill. Dec. 14, 2015); *Restoration Specialists, LLC v. Hartford Fire Ins. Co.*, 2011 WL 332510, at *5–6 (N.D. Ill. Jan. 31, 2011).

The application of § 2-2201(b) to this case is straightforward. As an insurance broker, RJ Ahmann is an "insurance producer." *See Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 2016 WL 2977274, at *7 (N.D. Ill. May 19, 2016) ("The IIPLA applies to insurance brokers as 'insurance producers.'"). J&A's breach of fiduciary duty claim is based on the standards governing the conduct of a fiduciary or a fiduciary relationship. And J&A's claim is not

19

premised on wrongful retention or misappropriation of money. So, by its terms, § 2-2201(b) precludes civil liability on the claim.

In its response to RJ Ahmann's motion for summary judgment, J&A does not say there is a genuine issue of material fact with respect to its claim for breach of fiduciary duty in Count V of its Amended Complaint. J&A instead asserts RJ Ahmann is not entitled to summary judgment as a matter of law because the IIPLA's automatic exemption does not apply in this case. J&A offers several arguments in support of this contention.

J&A claims the Court already dealt with the application of § 2-2201(b) to this case when it denied RJ Ahmann's motion to dismiss. In its order on RJ Ahmann's motion to dismiss, the Court framed the issue to be decided as "whether the Amended Complaint adequately alleges RJ Ahmann breached its fiduciary duty . . . in procuring a policy that did not meet J&A Freight's requirements." Order Dated 9/21/15, [ECF No. 61 at 3]. The Court noted some of the contours of an insurance broker's fiduciary duty under Illinois common law and described the relevant allegations from J&A's complaint. *Id.* The Court's analysis led it to conclude that, at the pleading stage and based on the papers then before it, RJ Ahmann had not carried its burden to show J&A had not plausibly alleged a breach of fiduciary duty. *Id.* The Court never discussed whether RJ Ahmann could be subject to civil liability if J&A eventually proved its allegations, and the Court never mentioned or cited the IIPLA.[8]

As an alternative to its argument that the Court already ruled on the application of § 2-2201(b) to this case, J&A argues the Court should find RJ Ahmann waived the IIPLA's

---

[8] J&A relies heavily on the fact that RJ Ahmann cited the IIPLA in its brief in support of that motion. Defendant RJ Ahmann Company's Memorandum in Support of Its Motion to Dismiss Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6), [ECF No. 54], at 4. In that filing, however, RJ Ahmann cited subsection (a) of the IIPLA, which deals with an insurance producer's duty of care, not subsection (b), which provides the automatic exemption for breach of fiduciary duty claims. *See id.* RJ Ahmann did not raise the argument it is raising now in its motion to dismiss.

exemption by failing to raise the issue at the motion to dismiss stage. J&A makes this argument in a one-sentence footnote unsupported by any authority. Plaintiff J&A's Response to Defendant RJA's Motion for Summary Judgment ("J&A's Response"), [ECF No. 98], at 5 n.1. J&A's failure to develop or support this argument is fatal. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("Moreover, 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).'") (citation omitted). Moreover, the Court is not aware of any case law supporting the proposition that a party waives every argument it fails to raise at the motion to dismiss stage.

J&A's next argument is that the three cases cited by the Court in its motion to dismiss order show § 2-2201(b) does not preclude civil liability in this case. *Garrick v. Mesirow Fin. Holdings, Inc.*, 994 N.E.2d 986 (Ill. App. Ct. 2013); *Cincinnati Ins. Co. v. Guccione*, 719 N.E.2d 787 (Ill. App. Ct. 1999); *Perelman v. Fisher*, 700 N.E.2d 189 (Ill. App. Ct. 1998). None of the cases supports this proposition. *Guiccione* does not "even mention[] section 2-2201, let alone analyzes its impact on [breach of fiduciary duty] claims." *Sports Arena Mgmt., Inc. v. K & K Ins. Grp., Inc.*, 2007 WL 2228622, at *2 (N.D. Ill. July 31, 2007). The same is true of *Perelman*, which only involved breach of contract and negligence claims. *Perelman*, 700 N.E.2d at 191. Chief Judge Castillo explained at some length why *Garrick* is unpersuasive to the extent it indicates that § 2-2201 does not define the full extent of civil liability for breach of fiduciary duty claims. *Landmark*, 2016 WL 2977274, at *8. Therefore, these cases cannot bear the weight that J&A places on them.

J&A's last contention is that the breach of fiduciary duty alleged in this case falls outside the scope of § 2-2201(b). J&A does not say this case fits within the statutory carve-out for wrongful retention and misappropriation claims. Rather, J&A maintains its claim turns on the

"making of misleading, incomplete, and/or false statements to J&A about the coverage afforded under the policy." J&A's Response, [ECF No. 98], at 7. J&A insists these allegations do not "concern[] the sale, placement, procurement, renewal, binding, cancellation of, or failure to procure any policy of insurance." 735 ILL. COMP. STAT. 5/2-2201(b).

A similar argument was raised in *Selective Insurance Company of The Southeast v. Homeworks Central Incorporated*, 2013 WL 1286982 (C.D. Ill. Mar. 26, 2013). In that case, an insurer sued a company that it insured ("HomeWorks") for breaching a workers' compensation insurance policy by not paying the premium. *Id.* HomeWorks had entered into the policy after an insurance producer ("TGT") allegedly said the premium calculation would not include sole proprietors and independent contractors who opted out of coverage. *Id.* Based on this representation, HomeWorks thought the premium only would be $8,753. *Id.* But the insurance company said the opt-outs counted for the purposes of determining the premium and demanded $120,142. *Id.* Consequently, HomeWorks filed a third-party complaint against TGT, alleging three counts, including breach of fiduciary duty. *Id.* at *1, 3.

The court recognized § 2-2201(b) would shield TGT from civil liability if: "(1) it is an insurance producer; (2) HomeWorks' breach of fiduciary duty cause of action concerns 'the sale, placement, procurement, renewal, binding, cancellation of, or failure to procure any policy of insurance'; and (3) HomeWorks failed to allege wrongful retention or misappropriation." *Id.* at *4. HomeWorks argued only that the second element was not satisfied because its breach of fiduciary duty claim was "premised on TGT's failure to accurately advise HomeWorks" about the amount of the premium. *Id.* The court rejected this theory as "elevat[ing] form over substance." *Id.* The court recognized HomeWorks' third-party complaint was premised on the harm HomeWorks suffered by purchasing an insurance policy based on TGT's supposedly bad

advice. *Id.* This harm, the court said, "stem[ed] directly from the procurement and purchase" of the policy. *Id.* Based on this reasoning, the court rejected HomeWorks' "linguistic variations" and found § 2-2201(b) precluded its claim against TGT. *Id.*

J&A's argument in this case amounts to the same type of wordplay. The sole reason J&A hired RJ Ahmann was to obtain insurance coverage. *See* Amended Complaint, [ECF No. 46], ¶ 59. J&A's breach of fiduciary duty claim is based entirely on the premise that RJ Ahmann misrepresented the terms of and failed to disclose accurate information about the policy that J&A purchased from Travelers. *See id.* ¶¶ 66–69. Based on RJ Ahmann's supposed misconduct, J&A alleges it purchased an insurance policy that did not provide as much coverage as the one it would have purchased if RJ Ahmann had not breached its fiduciary duty. *Id.* ¶¶ 66–71. The relationship between J&A and RJ Ahmann, RJ Ahmann's alleged misconduct, and J&A's alleged harm all "concern[] the sale, placement, procurement, renewal, binding, cancellation of, or failure to procure any policy of insurance." 735 ILL. COMP. STAT. 5/2-2201(b). Therefore, the Court rejects J&A's argument that its breach of fiduciary duty claim is outside the scope of § 2-2201(b).

For all of these reasons, RJ Ahmann is entitled to summary judgment on Count V of J&A's Amended Complaint.

### 2. Count VI: Negligence

In Count VI, J&A alleges a claim for negligence. Amended Complaint, [ECF No. 46], ¶¶ 74–79. J&A claims RJ Ahmann was negligent in two ways. J&A says RJ Ahmann failed to inform J&A that the insurance policy it procured from Travelers was ambiguous. *Id.* ¶ 76. J&A also contends RJ Ahmann falsely informed J&A that the policy had "a $150,000 Increased Limit for Coleman Cable Shipments, subject to a $2,500 Theft Deductible." *Id.* ¶ 78. To prevail on its

23

negligence claim, J&A ultimately must establish RJ Ahmann owed a duty to J&A, RJ Ahmann breached that duty, and J&A suffered an injury that was proximately caused by the breach. *Melrose Park Sundries*, 927 N.E.2d at 135.

The IIPLA codifies the common law duty of an insurance producer. *Office Furnishings, Ltd. v. A.F. Crissie & Co.*, 44 N.E.3d 562, 568 (Ill. App. Ct. 2015); *Garrick*, 994 N.E.2d at 991. This statute "alone defines the duty of ordinary care regarding the procurement of insurance in Illinois" and courts "have been reluctant to expand the duties of brokers and agents beyond those articulated in the statute." *M.G. Skinner*, 845 F.3d at 320, 322. When an insured or prospective insured requests "specific insurance coverage" from an insurance producer, § 2-2201(a) requires that the producer "exercise ordinary care and skill in renewing, procuring, binding, or placing the coverage requested by the insured or proposed insured." 735 ILL. COMP. STAT. 5/2-2201(a); *see also M.G. Skinner*, 845 F.3d at 318.

### i. Misrepresentation

RJ Ahmann argues it is entitled to summary judgment on J&A's claim that RJ Ahmann was negligent because it "falsely informed J&A that it was procuring a policy that has a $150,000 Increased Limit for Coleman Cable shipments, subject to $2,500 Theft Deductible." Amended Complaint, [ECF No. 46], ¶ 78. RJ Ahmann contends that it never breached this duty because it did not represent that the Coleman Cable endorsement modified the Carrier Dishonesty Exclusion or otherwise provided coverage up to $150,000 for all theft of the Coleman Cable shipments. J&A responds by saying there is a genuine issue of material fact as to whether RJ Ahmann misrepresented or misled J&A about the terms of the policy. The Court agrees with J&A that a jury should decide this issue.

J&A's argument turns on the deposition testimony of J&A's CFO, Greg LaBonar. LaBonar said he spoke with Mark Yunker (an employee of RJ Ahmann) on multiple occasions—often before renewing J&A's policy—about whether J&A was covered for theft. LaBonar's Dep., [ECF No. 99-4], at 34–36. He testified that, during those discussions, Yunker and LaBonar discussed J&A's desire to be covered for theft. *Id.* 36–37. LaBonar never spoke with Yunker about carrier dishonesty or imposter theft. *Id.* at 87–88. They only spoke of theft "in general" and did not talk about different types of theft. *Id.* at 36, 88, 90, 91. But LaBonar clearly and repeatedly testified Yunker told him that any theft of the Coleman Cable shipment would be covered up to $150,000. *See id.* at 89 ("we talked about needing . . . to make sure that we are protected in any way, shape, or form up to $150,000 to cover the loss of the shipment"); *id.* at 90 ("He said theft would be covered, which was reiterated by his team with Nicole in an e-mail."); *id.* at 91 ("it was . . . reiterated to him, that we need to be covered for any type of theft, and he assured me we were covered."); *id.* at 100 ("Mark said the rider up to $150,000 would cover us for everything"); *id.* ("he told me that the rider would cover us up to $150,000 . . . and it would cover anything"); *id.* at 101 ("I remember specifically asking him, okay, let me clarify. We are covered for theft for Coleman Cable up to $150,000, and he said yes."); *id.* at 182 ("I was instructed that it was covered up to 150,000 for anything, any theft or loss of Coleman Cable"). In interpreting this testimony, the Court "must construe the facts and draw all reasonable inferences in the light most favorable" to J&A. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

RJ Ahmann essentially ignores this testimony, even in its reply brief, and instead raises three arguments in support of its motion for summary judgment. RJ Ahmann contends it could not have misled J&A about the coverage J&A had with respect to the Coleman Cable shipments

because J&A did not know about, much less ask about, coverage for carrier dishonesty. What J&A knew about different types of theft, however, may be beside the point if Yunker said what LaBonar testified he said. LaBonar did not testify that Yunker said the policy covered only the types of theft J&A knew about. LaBonar testified Yunker said it covered "anything," "any type of theft," and so on. Therefore, regardless of what J&A knew, if LaBonar's testimony is truthful, a reasonable jury could find that Yunker misrepresented the coverage that RJ Ahmann had procured for J&A or that it misled J&A concerning the extent of the coverage the policy provided for theft. To be clear, a reasonable jury also could find that Yunker did not mispresent the coverage and did not mislead J&A in this respect. But that is why this is a jury question and not a decision to be made as a matter of law.

RJ Ahmann next argues that, because J&A did not request a policy that eliminated all exclusions and exceptions for Coleman Cable shipments, RJ Ahmann was not required to procure such a policy. Even if RJ Ahmann were correct about the scope of its duty, this argument would miss the point. RJ Ahmann still would have owed a duty to exercise ordinary care and skill with respect to the coverage that J&A requested and RJ Ahmann procured. LaBonar testified that, in connection with his discussions with RJ Ahmann related to the renewal of J&A's policy, RJ Ahmann misstated the coverage that the policy would provide. RJ Ahmann has not cited any case holding an insurance producer's duty of care is so limited as to allow it to communicate false or misleading information about the scope of coverage under a policy while the insured is deliberating about whether to procure or renew the policy. This is the essence of J&A's negligent misrepresentation claim against RJ Ahmann. Therefore, RJ Ahmann has failed to show that it is entitled to judgment as a matter of law based solely on the supposedly limited scope of J&A's request. *See Vertex Ref., NV, LLC v. Nat'l Union Fire Ins., Co. of Pittsburgh,*

*PA*, 2017 WL 977000, at *5 (N.D. Ill. Mar. 14, 2017) ("In short, an insurance producer which is cavalier about the accuracy of the information it provides to a party seeking coverage can hardly be said to have exercised ordinary care."); *Homeworks*, 2013 WL 1286982, at *6 (finding § 2-2201(a) imposes "a duty in tort to communicate accurate information"); *see also M.G. Skinner*, 845 F.3d at 318 ("Second, the duty can be breached if a broker fails to disclose information about the insurer that would be material to the insured's decision to place the insurance with that insurer.").

RJ Ahmann's last argument is that it did not breach any duty because J&A had a duty to know what was in its policy and RJ Ahmann did not have a duty to interpret the policy for J&A. That is true, but it does not insulate RJ Ahmann from liability if it misrepresented or misled J&A about the coverage available under the policy J&A was considering buying. RJ Ahmann cites one case in support of its argument. In that case, a plaintiff insured sued its insurer for coverage. *Pittway Corp. v. Am. Motorists Ins. Co.*, 370 N.E.2d 1271, 1272 (Ill. App. Ct. 1977). The insured also sued its insurance broker, alleging that, after the insured suffered the loss at issue, the broker incorrectly told the insured that its policy would not cover the loss. *Id.* at 1277. The Illinois appellate court rejected this argument. *Id.* The court recognized an insured has the burden "to know the import and meaning of [its] insurance contract," and refused to impose a duty on insurance brokers to advise clients about the meaning of "insurance policies which have *previously* been faithfully procured according to the customer's requirements." *Id.* (emphasis added).

*Pittway* is not like this case. In *Pittway*, the alleged misrepresentation occurred after a policy had been procured and a loss had occurred. The misrepresentation related solely to the insured's attempt to obtain coverage from its insurer. In this case, however, the alleged

misrepresentations occurred when J&A was deciding whether to renew is policy. The alleged misrepresentations were not related to the submission of a claim, but, rather, to determining whether the policy under consideration provided enough coverage or whether more was needed. Therefore, RJ Ahmann has not shown that, as a matter of law, its conduct cannot constitute a breach of duty. *See Golf v. Henderson*, 876 N.E.2d 105, 111 (Ill. App. Ct. 2007) ("However, the appellate court has noted that [an insured's duty to know the contents of his policy] is not an absolute bar to causes of action brought by an insured against an insurance agent or broker as opposed to causes of action brought by an insured against an insurer."); *see also Perelman v. Fisher*, 2700 N.E.2d 189, 193 (Ill. App. Ct. 1998).

For all of these reasons, there is a genuine issue of material fact with respect to whether RJ Ahmann falsely or misleadingly informed J&A about the scope of the coverage under its policy when J&A was in the process of renewing its policy. That issue of fact precludes summary judgment in RJ Ahmann's favor.

### ii. Ambiguous Policy

J&A also alleges RJ Ahmann breached its duty of ordinary care by failing to tell J&A that the insurance policy it procured from Travelers was ambiguous. Amended Complaint, [ECF No. 46], ¶ 76. The parties' dispute focuses on a decision issued by an Oregon district court in October 2012 holding that a Travelers' policy with the same language as that in J&A's policy is ambiguous. *Intransit*, 2012 WL 5208170. In its ruling, the court interpreted the same Travelers' policy at issue in this case (without the Coleman Cable Endorsement, of course). The district court found the word "carrier" as used in the policy to be ambiguous and therefore construed it against Travelers. The court entered judgement for the insured in that case and against Travelers for the full amount of the insured's loss. On appeal, in 2014, the Ninth Circuit agreed that the

term "carrier" in the policy was ambiguous. *Intransit*, 583 F. App'x at 798. But the court of appeals concluded the district court erred by interpreting the word "carrier" differently in different parts of the policy. *Id.* Based on that holding, the Ninth Circuit reversed the lower court's decision and held the insured was subject to a $50,000 limit on coverage under the policy.[9]

J&A claims RJ Ahmann knew of the Oregon district court decision before J&A suffered the Coleman Cable loss but negligently failed to tell J&A about it until a day or two after that Coleman Cable loss. There is no evidence in the record that RJ Ahmann knew about the Oregon district court decision before J&A renewed its Travelers policy. J&A cites two cases in support of its argument that RJ Ahmann's failure to tell it about the Oregon district court decision before the Coleman Cable loss was negligent.

Both characterize the duty to disclose all material facts as arising from the fiduciary relationship, not the duty of ordinary care and skill. *Garrick*, 994 N.E.2d at 991; *Guccione*, 719 N.E.2d at 791. But there is support for the proposition that an insurance producer's ordinary duty of care under § 2-2201(a) requires it to disclose material facts known to it. *See AYH Holdings, Inc. v. Avreco, Inc.*, 826 N.E.2d 1111, 1131 (Ill. App. Ct. 2005) ("Thus, whether due to common knowledge or unequal knowledge, a broker in Illinois has a duty to inform an insured of material information in its possession.").

RJ Ahmann argues it did not have a duty to disclose the Oregon district court decision before Coleman Cable loss occurred in August 2013. In essence, RJ Ahmann contends the Oregon district court decision, which was issued on October 22, 2012, was not a material fact that it had a duty to disclose to J&A at any time material to the events that gave rise to this case.

---

[9] This decision is discussed earlier in this Memorandum Opinion and Order in the context of Travelers' motion for summary judgment.

In response, J&A relies solely on the fact that RJ Ahmann's Vice President emailed a copy of the district court's decision to another client who had suffered a similar loss while the appeal was pending. In the email, which was sent on June 18, 2013 (two months after J&A renewed its Travelers policy but before the Coleman Cable loss occurred), Yunker suggests the client have an attorney review the Oregon decision and the client's "situation, and then use the case to request that Travelers reconsider their position." [ECF No. 99-6]. Presumably, Travelers had denied coverage for that RJ Ahmann client based on the language that the court found to be ambiguous in the Oregon decision.

As noted above, § 2-2201(a) imposes a duty of care "in renewing, procuring, binding, or placing" coverage. 735 ILL. COMP. STAT. 5/2-2201(a). There is no evidence in the record that shows RJ Ahmann knew of the Oregon district court decision when J&A was renewing its policy with Travelers. Instead, the email upon which J&A relies only shows Yunker (and, by extension, RJ Ahmann) knew of the decision roughly two months after J&A renewed its policy. J&A has not cited, and the Court is not aware of, any case holding an insurance producer owes a duty to inform a client who renewed coverage months earlier about a court decision interpreting that coverage. On the argument and record now before it, the Court cannot say RJ Ahmann owed such a duty to J&A.

Moreover, J&A's argument that the Oregon district court decision constitutes a material fact is vague and speculative. J&A does little more than simply note the decision exists and never offers a meaningful explanation of how it would have acted differently had it known of the decision before August 2013. The Oregon district court held that the Carrier Dishonesty Exclusion did not apply to fraudulent carriers and, consequently, that the loss suffered by the insured in that case was fully covered. In other words, the Oregon district court decision

supported the proposition that J&A had full coverage under its policy with Travelers for a loss attributable to a fraudulent carrier despite the Carrier Dishonesty Exclusion. The court of appeals did not reverse that decision until 2014, well after the Coleman Cable loss occurred. The Court cannot assume the Oregon district court decision would have been material to J&A based on speculative and undeveloped assertions in briefs. J&A does not offer a plausible explanation of how it would have acted differently if it had known, after it purchased the Travelers' policy at issue in this case, that a district court in Oregon had held language in that policy was ambiguous and, as a result, had found the insured was covered for the full amount of its loss.

As the party who would bear the burden of proof at trial, J&A was required to "make a sufficient showing to establish the existence" of all of the elements "essential to [its] case." *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Seventh Circuit repeatedly has warned litigants that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence is has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)) (internal quotation marks omitted). J&A has failed to deliver. It has not identified case law or evidence that creates a triable issue as to whether RJ Ahmann was negligent in failing to inform J&A of the Oregon decision until after the Coleman Cable loss. Therefore, RJ Ahmann is entitled to summary judgment on this claim.

## V.  CONCLUSION

For the reasons stated above, the Court rules as follows. Travelers is entitled to summary judgment on Counts I and II and its Motion [ECF No. 87] is granted. J&A's Motion [ECF No. 86] is denied as moot. RJ Ahmann's Motion [ECF No. 90] is granted in part and denied in part.

Summary judgment is granted in favor of RJ Ahmann on Count V. With respect to Count VI, summary judgment is denied on the claim that RJ Ahmann negligently misrepresented the scope of J&A's coverage but granted in favor of RJ Ahmann on the claim that it negligently failed to inform J&A that its policy was ambiguous.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: September 26, 2017